MASTER AND WARDENS OF THE PORT OF NEW ORLEANS *v.* SHIP MARTHA J. WARD et als.

The 8th section of the Constitution of the United States, which declares that Congress shall have power to regulate commerce, does not prevent the exercise of such power by the States, as far as is necessary for the police regulations of their domestic commerce, in regard to which Congress has not deemed it expedient to make any regulations.

The Act of the Legislature of 1855, relative to the Board of Master and Wardens, which provides for the payment of services actually rendered or the tender of such services, is not a violation of the clause of the Constitution of the United States which gives to Congress the power of regulating commerce.

The fees allowed to the Master and Wardens are in no sense imposts or duties on imports or exports.

APPEAL from the Third Justice's Court of New Orleans.

*C. Roselius* and *M. Hahn*, for plaintiffs. *Gaither & McPheeters* for defendants and appellants.

COLE, J. The Master and Wardens of the port of New Orleans instituted this action to recover ten dollars for fees of survey, and five dollars for entrance fee.

There was judgment for plaintiffs, and defendant has appealed.

The duties of the Master and Wardens are detailed in the Acts of 1855, p. 489, and in those of 1857, p. 88. By the former, they are obliged, if called upon by the captain of any ship or vessel arriving from sea, to inspect the manner in which the hatches of such ship or vessel were secured previous to the opening thereof for the purpose of discharge, and to be present at the opening of the same. They are also surveyors of damaged goods brought into the port of New Orleans in any ship or vessel, and, with the assistance of one or more skillful carpenters, surveyors of any damaged vessel, and any vessel deemed unfit to proceed to sea. It is their duty, also, to order and direct the sale of damaged goods by public auction.

For these services fees are designated.

By the Act of 1857, a certain supervisory control over pilots, and other duties relative to the pilots, are vested in the Master and Wardens, for which no fees are provided. This control and these duties are contained in sections 4, 5, 13, 15, 16, 17 and 20 of the Act of 1857.

The constitutionality of the Act of 1855 is the only question in the case.

It is contended that it is opposed to the 8th and 10th sections of Article 1st of the Constitution of the United States, which declare that " Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," and that " no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws," &c.

The creation of a Board of Port Wardens has never been deemed an usurpation of the power of Congress to regulate commerce, within the intendment of the Constitution of the United States.

The statutes organizing and establishing a Board of Port Wardens are of the same class as those relative to inspection, quarantine and pilotage laws, or those for the regulation of the internal commerce of a State. 9 Wheaton, p. 1, *Gib-*

37

bons v. *Ogden;* 11 Peters, p. 102, *City of New York* v. *Geo. Milne;* 2 Peters, p. 245, *Wilson et al.* v. *Black Bird Creek M. Company;* 18 Howard, p. 421, *Pennsylvania Bridge Company.*

The 8th section of the Constitution of the United States declares, that Congress shall have power to regulate commerce, but it does not say, it shall have the exclusive power; and in the event it does not think it expedient to exercise this power, there is no prohibition against the exercise of it by the States, as far as is necessary for the police regulations of their domestic commerce.

In *Wilson* v. *The Black Bird Creek Marsh Company,* the question arose in the Supreme Court of the United States, whether the State of Delaware had the right to stop a navigable creek, through which the tide ebbed and flowed.

The counsel for the plaintiffs in error argued that the right insisted upon came in conflict with the power of the United States " to regulate commerce with foreign nations and among the several States."

Marshall, C. J., delivering the opinion of the court, said : " If Congress had passed any Act which bore upon the case; any Act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks, into which the tide flows, and which abound throughout the lower country of the Middle and Southern States ; we should feel not much difficulty in saying that a State law coming in conflict with such Act would be void. But Congress has passed no such Act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States ; a power which has not been so exercised as to affect the question." 2 Peters, p. 252.

In *Cooley* v. *Board of Wardens of port of Philadelphia,* in which a question arose, whether the laws for the regulation of pilots and pilotage enacted by the State of Pennsylvania were in conflict with the power of Congress over commerce and the laying of duties on imports and exports, Curtis, J., delivering the opinion of the court, said : " The power to regulate commerce embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature ; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States, in every part ; and some, like the subject now in question, as imperatively demanding that diversity which alone can meet the local necessities of navigation. Either absolutely to affirm or deny that the nature of this power requires exclusive legislation by Congress, is to lose sight of the nature of the subjects of this power, and to assert, concerning all of them, what is really applicable but to a part. Whatever subjects of this power are in their nature national, or admit only of one uniform system, a plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress. That this cannot be affirmed of laws for the regulation of pilots and pilotage is plain.

" We are of opinion that this State law was enacted by virtue of a power residing in the State to legislate, that it is not in conflict with any law of Congress ; that it does not interfere with any system which Congress has established by making regulations."

Daniel, J., concurred in the decree, but upon different reasons. His opinion was " that the power of enacting pilot laws, although in some degree connected with commercial intercourse, does not come essentially and regularly within that power of commercial regulation vested by the Constitution in Congress. The

power delegated to Congress by the Constitution relates properly to the terms on which commercial engagements may be prosecuted ; the character of the articles which they may embrace ; the permission or terms according to which they may be introduced ; and do not necessarily nor even naturally extend to the means of precaution and safety adopted within the waters or limits of the States, by the authority of the latter, for the preservation of vessels and cargoes, and the lives of navigators or passengers.   These last subjects are essentially local ; they must depend upon local necessities which call them into existence, must differ according to the degrees of that necessity.   They have no connection with contract, or trafic, or with the permission to trade in any subject, or upon any conditions. They belong to the same conservative power which undertakes to guide the track of the vessel over 'the rocks or shallows of a coast or river; which directs her mooring or her position in port, for the safety of life and property, whether in reference to herself or to other vessels, their cargoes and crews ; which, for security against pestilence, subjects vessels to quarantine, and may order the total destruction of the cargoes they contain.   This is a power which is deemed indispensable to the safety and existence of every community.   It may well be made a question, therefore, whether it could, under any circumstances, be surrendered ; but certainly, it is one which cannot be supposed to have been given by mere implication, and as incidental to another, to the exercise of which it is not indispensable."   12 Howard, 319, 326, *Cooley* v. *Board of Wardens of the port of Philadelphia*.

In *Gibbons* v. *Ogden*, Marshall, C. J., delivering the opinion of the court, and speaking of inspection laws, said :

" They form a portion of that immense mass of legislation, which embraces every thing within the territory of a State, not surrendered to a general government ; all of which can be most advantageously exercised by the States themselves.   Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, &c., are component parts of this mass.

" Since, however, in exercising the power of regulating their own purely internal affairs, whether of trading or police, the States may sometimes enact laws, the validity of which depends on their interfering with, and being contrary to, an Act of Congress passed in pursuance of the Constitution, the court will enter upon the inquiry, whether the laws of New York have, in their application to this case, come into collision with an Act of Congress.   Should this collision exist, it will be immaterial whether those laws were passed in virtue of a concurrent power 'to regulate commerce with foreign nations and among the several States, ' or in virtue of a power to regulate their domestic trade and police.   In one case and the other, the acts of New York must yield to the law of Congress.   9 Howard, 203, 210, *Gibbons* v. *Ogden*.

The preceding quotations are applicable to the case at bar.   The laws relative to the Master and Wardens of the Port of Orleans, cannot, in the sense of the Constitution of the United States, be said to regulate commerce, although they are upon a subject incidental to it, and are incidentally necessary for the carrying on of commerce.

Quarantine laws and Pilotage laws are embraced in the definition of regulating commerce, and affect it as much as the laws relative to Master and Wardens. If the former can be passed by the States, the latter can also.

The Constitution of the United States declares, that " Congress shall have :

PORT WARDENS
SHIP M. J. WARD.

power to establish uniform laws on the subject of bankruptcies throughout the United States." Constitution United States, Art. 1, § 8. This court, however has declared : "That the insolvent or bankrupt laws of a State, if not suspended by the enactment of a uniform bankrupt law by Congress, are constitutional and valid as to all posterior contracts entered into between citizens of the State where such laws exist." *Northern Bank of Kentucky* v. *Squires,* 8 An. 339 ; Story on the Constitution, § 1066, 1109.

The power given to Congress to establish bankrupt laws is just as plenary as that to regulate commerce ; if, then, in the absence of national legislation the States can pass laws relatives to bankruptcy, they can also pass those laws relative to commerce, which do not attempt to interfere with the peculiar sphere of Congress, but only endeavor to give force to the laws of Congress relative to commerce, such as those now under consideration relative to Master and Wardens.

In the absence of national legislation for the protection of commerce, there is an inherent right in the States to protect themselves.

Commerce is of vital importance to the States, and unless there are pilots to conduct the shipping to safe harbors, officers vested with the duties of Master and Wardens, and other persons authorized to perform the official acts necessary for the operations of commerce, the merchant will seek other ports for the disposal of his merchandize.

It is the interest of every State to attract as much commerce as possible ; each State will, therefore, essay to create such police statutes relative to commerce, as will be of the greatest convenience to it.

The duties performed by the Master and Wardens, do not clash with the powers of Congress to regulate commerce. If Congress desired, it might perhaps be within its exclusive dominion, to appoint officers to execute the duties now incumbent upon plaintiffs.

Congress has not deemed it proper to use the power, being no doubt of opinion that as the regulation of the operations of commerce, so far as relates to the case at bar, are ministerial and the conveniences of commerce may require them to be different in the several states, that it would be wiser to abstain from legislating thereupon, and allow each State to enact its own laws. The States have, therefore, the right to do what is essential for the protection of the shipping entering their ports, and of the merchandise conveyed in such vessels.

As the creation of a Board of Master and Wardens is not in conflict with the Article of the Constitution relative to the power of Congress to regulate commerce, neither is it opposed to that part of the Constitution which prohibits the States from laying any impost or duty on imports or exports.

The Act of 1855, relative to the Board of Master and Wardens, merely provides for the payment of services actually rendered, or the tender of such services. The fees accorded, cannot be regarded as imposts or duties on imports or exports ; it is a contradiction of terms so to view them.

The remarks of the Supreme Court of the United States relative to the Pilot laws, are applicable to the present case. In *Cooley* v. *Board of Wardens of port of Philadelphia,* in speaking of the law of Pennsylvania which appropriated the half-pilotage fees for the purpose of forming a charitable fund for distressed or decayed pilots, they say : "The provision of the Constitution as to imposts and duties was intended to operate upon subjects actually existing and well understood when the Constitution was formed. Imposts and duties on imports, ex-

ports and tonnage were then known to the commerce of the civilized world to be as distinct from fees and charges for pilotage, and from the penalties by which commercial States enforced their pilot-laws, as they were from charges for wharfage or towage, or any other local port-charges for services rendered to vessels or cargo ; and to declare that such pilot-fees or penalties are embraced within the words imposts or duties on imports, exports or tonnage, would be to confound things essentially different, and which must have been known to be actually different by those who used this language." 12 Howard, 314, *Cooley* v. *Board of Wardens*.

" An impost, tax, or duty," says Judge Martin, " must be confined to the idea which they commonly present to the mind; exactions to fill the public coffers, for the payment of the debt, and the promotion of the general welfare of the country, not to a retribution, provided to defray the expenses of building bridges, erecting causeways, or removing obstruction in a water course, to be paid by such individuals only who enjoy the advantage resulting from such labor and expense." 11 M. p. 324.

In the case of *The Master and Wardens of the port of New Orleans* v. *Prats*, Judge Martin said : " The constitutionality of the Act of 1805, which first allowed fees to the Master and Wardens, (B. & C's. Dig. p. 465), has never been questioned, although they have been claimed for nearly forty years." 10 Rob. 460.

It is, however, contended, that even if it is not contrary to the Constitution of the United States, to allow fees to the Master and Wardens for services actually rendered, that the sixth section of the Act of March 15th, 1855, is unconstitutional.

This section is a reënactment of that of 1821, and provides : " That in addition to the fees allowed to the Master and Wardens, they shall be entitled to demand and receive for each vessel arriving in the port of New Orleans from sea, the sum of five dollars, whether they be called upon to perform any services or not, which sum they shall be entitled to demand of the captain, owner, or consignee of every such vessel, and in case of failure or refusal to pay the same, they shall have the right to proceed for the recovery of the same against the said vessel, before any Justice of the Peace, or other competent tribunal. Session Acts, 1855, p. 490. § 6.

Even if the Master and Wardens performed no direct services as a compensation for the fee of five dollars, still this section could not be considered as laying a duty or impost on imports or exports, or as a burden imposed upon commerce by taxing vessels coming from sea.

The Master and Wardens are obliged to be always ready to perform their official services for any vessel that may need them. They are appointed for the benefit of the shipping, and their compensation in such cases can be likened to half-pilotage.

Section 18 of the Act of 1857, relative to Pilots, p. 90, provides : " That if the master of any ship or vessel coming or going out of any of the mouths of the Mississippi river, shall refuse to receive on board and employ a pilot, the master or owner of such ship or vessel, shall pay to such Pilot, who shall have offered to go on board and take charge of the vessel, half-pilotage."

The Supreme Court of the United States in *Cooley* v. *Board of Wardens of port of Philadelphia*, in speaking of a provision of the law of Pennsylvania, relative to pilots, which allowed half-pilotage, when no direct services were rendered, say :

" We think this particular regulation concerning half-pilotage fees, is an appropriate part of a general system of regulations of this subject. Testing it by the practice of commercial States and countries legislating on this subject, we find it has usually been deemed necessary to make similar provisions. Like other laws, they are framed to meet the most usual cases, *quæ frequentius accidant ;* they rest upon the propriety of securing lives and property exposed to the perils of a dangerous navigation, by taking on board a person peculiarly skilled to encounter or avoid them, upon the policy of discouraging the commanders of vessels from refusing to receive such persons on board at the proper times and places ; and upon the expediency, and even intrinsic justice, of not suffering those who have incurred labor and expense and danger to place themselves in a position to render important service generally necessary to go unrewarded, because the master of a particular vessel either rashly refuses their proffered assistance, or, contrary to the general experience, does not need it. There are many cases in which an offer to perform, accompanied by present ability to perform, is deemed by law equivalent to performance. The laws of commercial States and countries have made an offer of pilotage service one of those cases, and we cannot pronounce a law which does this to be so far removed from the usual and fit scope of laws for the regulation of pilots and pilotage as to be deemed, for this cause, a covert attempt to legislate upon another subject under the appearance of legislating on this one."

If, then, half-pilotage fees are not contrary to the Constitution of the United States, it would seem that the sixth section of the Act of 1855 is not unconstitutional.

There is, however, another reason why this section is constitutional.

The Act of 1857, p. 88, in sections 4, 5, 13, 15, 16, 17 and 20 vest the Master and Wardens of the Port of New Orleans with various powers and obligations, for which no fees are allowed.

An examination of these sections will show, that they provide by the intervention and action of the Master and Wardens for the maintenance of order and discipline among the pilots, and for other things which tend to the advantage and safety of vessels coming from sea into the port of New Orleans.

If these duties were not performed by the Master and Wardens, it would be necessary to have them executed by other officers, who would necessarily be paid by a tax laid upon vessels coming from sea into the port of New Orleans. We say they would be thus paid, because these duties are for the benefit of such vessels, and, without the performance of such duties, they would be exposed to be lost, and of course it is just that they who receive the benefit should bear the expense.

Suppose that one of the pilots had been appointed by the Governor, by virtue of a statute, to execute the same duties as are detailed in these sections, and that the law had authorized the pilot to charge five dollars upon every vessel coming into the port as compensation for his duties, certainly no one could dispute the constitutionality of such a tax, without at the same time contesting the constitutionality of the pilot laws which provide for the compensation of pilots; because, if pilots be necessary, they must also be subjected to certain regulations and to the supervision of persons in authority, so that they may faithfully do their duty, and safely and skillfully guide vessels from the sea into the port of New Orleans.

The principle is the same whether these duties are to be performed by a pilot

or by the Master and Wardens. It is indeed wiser that they should be the province of the latter than of the former; for the Master and Wardens would not probably have such intimate relations with the pilots as one of their own number, and their impartiality would not be affected thereby.

The law has provided against the risk of partiality and interest, for the fourth section of the Act of 1855, (Sess. Acts, p. 490,) declares, "that neither the Master nor any of the Wardens aforesaid shall be concerned, directly or indirectly, in any pilot-boat, or with any branch-pilot, in respect to the business of his trust."

Although the services directed by these sections are not directly rendered by the Master and Wardens to the vessels coming from sea, yet they are rendered through the pilots, because the latter perform their official duties to the vessels with more fidelity and skill, under the supervisory care of the Master and Wardens, than would otherwise be the case. 2 An. 538, *First Municipality* v. *Pease;* 11 M. 324, *State* v. *Navigation Co.; Cooley* v. *Board of Wardens,* 12 Howard, p. 299.

As these services are performed indirectly, the plaintiffs are as much entitled to be paid for them as if they were done directly, and indeed, from the nature of the services, it is impossible they should be directly performed.

The payment of five dollars is, therefore, the compensation for services received by vessels, which services are necessary for their safety, and is not against the Constitution of the United States, in the absence of any law of Congress providing for the performance of the same services as those rendered by the Master and Wardens.

Judgment affirmed, with costs.

VOORHIES, J., absent.